UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| Orbital ATK, Inc., a Delaware corporation, and Alliant Techsystems Operations LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>vs.<br><br>Heckler & Koch GmbH, a German limited liability company,<br><br>Defendant. | Case No.: 17-250<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Orbital ATK, Inc. and Alliant Techsystems Operations LLC (together "Orbital ATK")[1] as and for their Complaint against Defendant Heckler & Koch GmbH ("H&K"), state and allege as follows:

## NATURE OF THE SUIT

1. This is an action between a prime contractor and a subcontractor arising from the subcontractor's refusal to perform. Orbital ATK seeks damages for H&K's breach of contract and a declaratory judgment confirming H&K's contractual obligations to cooperate in the transfer of certain intellectual property to Orbital ATK, thereby enabling Orbital ATK to have the work completed by another manufacturer.

[1] "Orbital ATK," as used here, also includes predecessors in interest Alliant Techsystems Inc., ATK Ordnance and Ground Systems LLC, and Alliant Integrated Defense Company LLC.

## PARTIES

2. Plaintiff Orbital ATK is a Delaware corporation with a principal place of business in Minnesota. Orbital ATK is a leading American aerospace and defense technology company that designs, builds, and delivers space, defense, and aviation-related systems to customers around the world.

3. Orbital ATK was formed by the 2015 merger of Orbital Sciences Corporation and Alliant Techsystems Inc. (commonly known as "ATK").

4. Alliant Techsystems Operations LLC is a Delaware limited liability company with a principal place of business in Minnesota. Its sole member is Orbital ATK.

5. Defendant H&K is a German limited liability company with its principal place of business in Oberndorf/Neckar, Germany. H&K has two members. The first is Heckler & Koch Management GmbH, a German limited liability company whose sole member is H&K AG, a German corporation with its principal place of business in Oberndorf/Neckar, Germany. The second is H&K AG directly. H&K is a global manufacturer of small arms for NATO-allied countries, including the United States ("U.S.").

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the federal common law of the U.S.

7. In addition, this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because the matter in controversy exceeds $75,000 and is between a citizen of Delaware and Minnesota and a citizen of Germany.

8. Venue is proper because a substantial part of the events giving rise to the claim occurred within this judicial district.

9. In the alternative, venue is proper pursuant to 28 U.S.C. § 1391(b)(3) because H&K is subject to the Court's personal jurisdiction.

10. This Court has personal jurisdiction over H&K, among other reasons, because H&K transacted business with Orbital ATK within the state of Minnesota by entering into contracts issued from Minnesota, by repeatedly visiting Minnesota for purposes of performing the contracts, and by contractually agreeing to the application of Minnesota law.

## DEMAND FOR JURY TRIAL

11. Orbital ATK respectfully demands a jury trial for all issues so triable.

## FACTUAL ALLEGATIONS

12. One of the most dangerous positions in which a U.S. soldier can find himself or herself is facing an armed enemy combatant who is in defilade, which means entrenched in a protected position. Confronting an enemy combatant in defilade is particularly dangerous where advancing on the position would require the U.S. soldier to leave his or her own protected position. Such a situation puts U.S. soldiers' lives in danger while allowing enemy combatants every advantage of their protected position.

13. In an effort to preserve U.S. soldiers' lives, the U.S. Army — and other nations' military forces — have used various means to dislodge an entrenched combatant in a defilade position. Artillery, mortars, and air support, for example, are all examples of

efforts to avert the losses concomitant with advancing through open space on an enemy combatant entrenched in a protected position.

14. More than twenty years ago, H&K and Orbital ATK began working together with the U.S. Army to develop a new alternative: the XM25, Counter Defilade Target Engagement ("CDTE") System (the "XM25" or "XM25 weapon system").[2]

15. The XM25 permits the individual soldier to fire 25mm rounds with air-bursting capability to defeat enemy combatants in defilade. The XM25 is a "smart" weapon that measures the distance to the enemy combatant's protective barrier, then programs the round to detonate only once it reaches the programmed distance. For example, when fired at an enemy combatant who is firing from behind a stone wall and is hiding in defilade, the soldier would obtain the range to the face of the wall with the system's laser range finder at increments of one to two meters. The soldier would aim the adjusted aim point of the XM25 above or to the side of the wall and pull the trigger. The XM25 round would fly to that adjusted aim point location and explode at that programmed range — just beyond the wall. The fragments of the air-bursting round would surround that area and impact the enemy combatant in their protective position. The XM25 permits the soldier to place an air-bursting round near the enemy who is in defilade while minimizing the risk to the soldier.

[2] The U.S. Government has had multiple names for this program since its initial stages, including, for example, the Objective Individual Combat Weapon Program ("OICW"), the Individual Airburst Weapon System ("IAWS") Program, and the Individual Semi-Automatic Airburst System ("ISAAS") Program.

## Orbital ATK and H&K contract with one another to develop the XM25, but H&K breaches

16. On or about October 8, 1994, H&K and Orbital ATK, entered into a cooperation agreement (the "1994 Agreement") in which both agreed to team in pursuing the contract for the Objective Individual Combat Weapon (the "OICW") Program with the U.S. Army, which is the weapon program that would become the XM25 program.

17. Orbital ATK then entered into a series of prime contracts with the U.S. Army for the work on the XM25 through the initial stages of program development.

18. Likewise, Orbital ATK entered into a series of subcontracts with H&K for work on the XM25 through the initial stages of program development. Each of these subcontracts issued from Minnesota.

19. On or about August 24, 2000, Orbital ATK, with the concurrence of H&K, entered into a Special License Agreement for Technical Data and Computer Software (the "Licensing Agreement") with the U.S. Army.

20. On or about September 29, 2005, H&K and Orbital ATK entered into the Teaming Agreement for the OICW Weapon System (the "Teaming Agreement"), which by its terms superseded the 1994 Agreement. The purpose of the Teaming Agreement was to permit H&K and Orbital ATK to "continue their exclusive teaming relationship into the System Development and Demonstration … phase of the OICW Program" in anticipation of the U.S. Army awarding to Orbital ATK the prime contract for that phase of program development.

21. A copy of the Teaming Agreement is attached as **Exhibit A**.

22. The Teaming Agreement provides, *inter alia*, that, in the event Orbital ATK is awarded the OICW Program prime contract, then Orbital ATK will award a subcontract to H&K.

23. As anticipated, the U.S. Army awarded the prime contract to Orbital ATK, and Orbital ATK subcontracted with H&K.

24. The U.S. Government issued a number of follow-on contracts and Orbital ATK continued to subcontract with H&K under each of these contracts for the continued development of the XM25.

25. On or about March 24, 2011, the U.S. Army awarded Prime Contract No. W91CRB-11-C-0024 (the "Prime Contract") to Orbital ATK to begin the Engineering and Manufacturing Development ("EMD") phase of the program.

26. On or about February 1, 2011, Orbital ATK issued Purchase Order MP00022951 (the "Subcontract") to H&K pursuant to the Prime Contract and the Teaming Agreement. A copy of the Subcontract with its change orders is attached as **Exhibit B**.

27. The Subcontract issued from Orbital ATK's Armament Systems Division facility in Plymouth, Minnesota.

28. The Subcontract expressly incorporates the General Terms and Conditions in Form AG-182. A copy of the General Terms and Conditions is attached as **Exhibit C**.

29. Section 1.39 of the Subcontract's General Terms and Conditions provides:

> Irrespective of the place of performance, this Contract shall be governed by and construed according to the laws of the State from which it issued, except that when Federal law of

> Government contracts exists on substantive matters requiring construction under the Contract, such Federal law shall apply in lieu of state law. Contractor will comply with all applicable Federal, State, and Local laws in the performance of this Contract.

30. H&K agreed to the Subcontract and commenced performance.

31. Pursuant to the Subcontract, H&K delivered five of the final design prototype XM25 weapon systems to Orbital ATK in Plymouth, Minnesota on or about November 2015.

32. The Subcontract required H&K to deliver twenty additional final design prototype XM25 weapon systems to Orbital ATK in Plymouth, Minnesota on or before May 16, 2016.

33. On or about April 2016, H&K's XM25 program manager represented to his counterpart at Orbital ATK that he was having trouble securing the necessary internal resources at H&K to complete the final series of tests required before delivery of the twenty additional prototype XM25 weapon systems**.**

34. H&K then failed to make timely delivery of the twenty additional prototype XM25 weapon systems due to be delivered to Orbital ATK in Plymouth, Minnesota on or before May 16, 2016.

35. On or about July 7, 2016, Orbital ATK sent a formal notice of default to H&K, noting that H&K had defaulted on the May 16 delivery and providing a ten-day cure period.

36. H&K responded to Orbital ATK's default notice by asserting that the Subcontract delivery was not due until September 24, 2016.

37. H&K made no delivery of the twenty additional prototype XM25 weapon systems on September 24, 2016 or since.

38. H&K has been paid by Orbital ATK in excess of $35 million in connection with the XM25 program.

**H&K seeks to excuse its nonperformance**

39. After having delivered numerous weapons for the XM25 program for more than twenty years, having delivered five of the final design prototype XM25 weapon systems, and having been paid in excess of $35 million, H&K abruptly began asserting that its performance under the Subcontract was excused by the St. Petersburg Declaration of 1868. H&K obtained a legal opinion from a German lawyer positing that the XM25, as designed, could theoretically be used in a manner that violated international laws of war (the "First Legal Opinion").

40. Orbital ATK sought to secure H&K's performance pursuant to the Subcontract, and, in discussions with H&K pursuant to a non-disclosure agreement, obtained a copy of and noted the obvious flaws (including the assumption that the XM25 weapon system would be intentionally misused) in the First Legal Opinion.

41. The Frankfurt office of the Baker & McKenzie law firm prepared a legal opinion, at Orbital ATK's request (the "Orbital ATK Opinion"), analyzing H&K's position and found that the XM25 weapon system did not violate international laws of war and that H&K did not face liability for supplying them to the U.S. Government. Orbital ATK shared this legal opinion with H&K.

42. H&K then sought a second legal opinion (the "Second Legal Opinion") which came to a similar conclusion detailed in the Orbital ATK Opinion.

43. Subsequently, H&K obtained a third legal opinion (the "Third Legal Opinion"), which opined that H&K's delivery of the XM25 weapon systems to the U.S. Government could subject H&K to criminal liability, although this opinion was based on an assumption that the U.S. Government intended to use the XM25 weapon system to violate international laws of war. Importantly, it acknowledged, however, that the manufacture and delivery of airburst weapon systems, such as the XM25, without evidence of such intent would not violate international laws of war.

44. After obtaining these legal opinions, H&K changed its position that it would not deliver the remaining twenty XM25 weapon systems and suggested it would be prepared to perform under the Subcontract and deliver the remaining twenty XM25 weapon systems but only if Orbital ATK furnished a special certification from the U.S. Government that the XM25 is intended for the purposes for which the U.S. Government created and funded the program and would not be used to target enemy human targets in a non-defilade position.

45. The U.S. Government refused to issue such a certification as a matter of policy, but noted that official publications of the U.S. already state the purpose of the XM25 weapon system.

**Orbital ATK attempts to resolve the dispute**

46. Pursuant to the agreements between the parties, Orbital ATK sought informal mediation with H&K in an attempt to resolve the dispute.

47. The informal mediation was held in Orbital ATK's offices in Washington, DC on July 26, 2016, but was not successful.

48. Pursuant to the agreements between the parties, Orbital ATK then sought formal mediation before a neutral mediator with H&K in an attempt to resolve the dispute.

49. H&K refused to engage in formal mediation before a neutral mediator.

50. On December 2, 2016, Orbital ATK terminated the Subcontract for H&K's default.

51. On December 8, 2016, Orbital ATK issued a 30-day cure notice to H&K, which notified H&K that it was in breach of a material obligation under the Teaming Agreement and that "H&K's failure to deliver the required XM25 weapons without restrictions is causing a critical impact to the XM25 program with the U.S. Government."

52. On January 7, 2017, thirty days passed without cure by H&K of its breach of material obligations under the Teaming Agreement and its failure to deliver the XM25 weapon systems.

53. On January 26, 2017, Orbital ATK terminated the Teaming Agreement.

54. In the interim, H&K's nonperformance under the Subcontract has adversely impacted the Prime Contract and has jeopardized the viability of the program moving forward. Additionally, the U.S. Army has raised the possibility of termination of the Prime Contract on multiple occasions. Even if the Prime Contract is not terminated, Orbital ATK has incurred and will incur additional costs as a direct result of the substantial delay caused by H&K's nonperformance and the need to re-procure the twenty weapons from an alternate manufacturer.

## COUNT I: BREACH OF CONTRACT

55. Orbital ATK restates, realleges, and incorporates herein the allegations of the preceding paragraphs.

56. The Subcontract is a valid and enforceable contract between H&K and Orbital ATK.

57. Orbital ATK fully performed its obligations under the Subcontract and Teaming Agreement, including having already paid H&K in full for the twenty XM25 weapon systems not delivered.

58. H&K materially breached the Subcontract by failing to deliver twenty XM25 weapon systems to Orbital ATK in Minnesota on or before May 16, 2016.

59. In addition and in the alternative, H&K materially breached the Subcontract and Teaming Agreement by failing to cooperate with Orbital ATK in the transfer to Orbital ATK of intellectual property related to the XM25 weapon system.

60. In addition and in the alternative, H&K materially breached the Subcontract by refusing to participate in the formal mediation process before a neutral mediator required by the Subcontract.

61. As a direct and proximate result of H&K's actions, Orbital ATK has suffered direct and consequential damages in an amount to be proven at trial. Orbital ATK's direct damages exceed $27 million, including, but not limited to, the costs of re-procurement, consideration required by the U.S. Government in exchange for the schedule extension required as a result of H&K's breaches of contract, lost profits, attorneys' fees, and other costs stemming directly from H&K's breaches. In addition,

Orbital ATK has suffered consequential damages far exceeding these direct damages, including, without limitation, reputational damages in the form of poor past performance ratings that directly affect Orbital ATK's ability to compete for U.S. Government business, as well as increased costs and lost profits attributable to Orbital ATK's rights under existing agreements that have been adversely impacted as a result of H&K's breaches.

## COUNT II: DECLARATORY JUDGMENT

62. Orbital ATK restates, realleges, and incorporates herein the allegations of the preceding paragraphs.

63. The Subcontract and the Teaming Agreement are valid and enforceable contracts between H&K and Orbital ATK.

64. Orbital ATK fully performed its obligations under the Subcontract and the Teaming Agreement.

65. H&K has materially breached the Subcontract and Teaming Agreement.

66. Section 1.14 of the Subcontract's General Terms and Conditions provides:

> All technical work Product, including, but not limited to, ideas, information, data, documents, drawings, software, software documentation, designs, specifications, and processes produced by or for Contractor, either alone or with others, in the course of or as a result of any work performed by or for Contractor which is covered by this Contract using funds paid for by ATK under this Contract shall be the exclusive property of ATK and be delivered to ATK promptly upon request.
>
> All inventions conceived, developed, or first produced by or for Contractor, either alone or with others, in the course of or as a result of any work performed by or for Contractor which

> is covered by this Contract using funds paid for by ATK under this Contract, and any patents based on any such inventions (both domestic and foreign), shall be the exclusive property of ATK….

67. Section 7.06.a. of the Teaming Agreement provides:

> In the event of a termination by ATK of this Agreement … or of a Subcontract awarded pursuant to this Agreement, as a result of a material breach or material default of HK, HK shall promptly transfer and grant, a non-exclusive license to ATK for all Intellectual Property owned or controlled by HK that is necessary to enable ATK independently to perform or have performed by others all Subcontract requirements that HK was obligated to perform under the defaulted Subcontract. Such license shall be negotiated in accordance with the terms of this paragraph to complete the Attachment A work that was presently under contract at the time of the alleged material breach or default. In the event the Subcontract is terminated due to HK's sole default: (1) this license for work already under contract will be royalty-free for the Intellectual Property and (2) HK shall, if requested by ATK, negotiate with ATK a royalty bearing, non exclusive license for Intellectual Property owned or controlled by HK that is necessary to enable ATK to complete all remaining phases of the OICW Program, not currently under contract at the time of the termination, which would have been performed by HK under the terms of this Agreement.

68. H&K approved of and concurred in Orbital ATK's entering into the Licensing Agreement.

69. Section 1.16 of the Licensing Agreement identifies H&K as a "Team Member."

70. The Licensing Agreement provides:

> Although this Agreement is between Alliant and the U.S. Government, the Team Members have approved this Agreement and will provide facilitating licenses to Alliant

> which will allow Alliant to pass license grants to the Government to fulfill the obligations in this Agreement.

71. H&K has refused to promptly deliver to Orbital ATK all technical work product and inventions described by section 1.14 of the Subcontract's General Terms and Conditions, including, but not limited to, tooling and technical data packages.

72. H&K has refused to promptly transfer and grant a non-exclusive license to Orbital ATK for all intellectual property owned or controlled by H&K necessary to enable Orbital ATK independently to perform or have performed by others all Subcontract requirements that H&K was obligated to perform under the defaulted Subcontract.

73. A justiciable controversy exists regarding whether Orbital ATK is entitled to declaratory judgment relief pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*

74. Orbital ATK is entitled to an declaratory judgment that the Teaming Agreement and Subcontract, as well as H&K's concurrence in and approval of the Licensing Agreement, require that (1) H&K immediately deliver all technical work product and inventions including, but not limited to, tooling and technical data packages produced by or for H&K in the course of or as a result of any work performed by or for H&K which is covered by the Subcontract and (2) H&K immediately transfer and grant a non-exclusive license to Orbital ATK in all intellectual property owned or controlled by H&K that is necessary to enable Orbital ATK independently to perform or have performed by others all Subcontract requirements.

## PRAYER FOR RELIEF

WHEREFORE, Orbital ATK prays for judgment in its favor and against H&K and, further, for:

1. Damages in an amount to be proven at trial but in excess of $27 million in direct damages and consequential damages far exceeding that amount;

2. The Court's Order declaring that (1) H&K immediately deliver all technical work product and inventions including, but not limited to, tooling and technical data packages produced by or for H&K in the course of or as a result of any work performed by or for H&K which is covered by the Subcontract and (2) H&K immediately transfer and grant a non-exclusive license to Orbital ATK in all intellectual property owned or controlled by HK that is necessary to enable Orbital ATK independently to perform or have performed by others all Subcontract requirements;

3. Orbital ATK's reasonable costs, expenses, and attorneys' fees; and

4. Such further relief as the Court may deem just and equitable.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Orbital ATK hereby demands a jury trial as to all issues so triable.

Dated: January 26, 2017

WINTHROP & WEINSTINE, P.A.

By: s/ Michael A. Rosow
Thomas H. Boyd (No. 0200517)
Michael A. Rosow (No. 0317998)
225 South Sixth Street
Suite 3500
Minneapolis, Minnesota 55402
(612) 604-6400
tboyd@winthrop.com
mrosow@winthrop.com

DENTONS US LLP
William O'Brien (*pro hac to be submitted*)
Erin Sheppard (*pro hac to be submitted*)
Daniel Morris (*pro hac to be submitted*)
1900 K Street NW
Washington, DC 20006
(202) 496-7500
william.obrien@dentons.com
erin.sheppard@dentons.com
daniel.morris@dentons.com

*Counsel for Plaintiffs Orbital ATK, Inc. and Alliant Techsystems Operations LLC*

13038054v2